# IN THE SUPREME COURT OF IOWA

No. 20–0030

Submitted October 21, 2021—Filed December 30, 2021

**STATE OF IOWA,**

    Appellee,

vs.

**LATRICE L. LACEY,**

    Appellant.

---

Appeal from the Iowa District Court for Scott County, Stuart P. Werling, Judge.

The defendant appeals her conviction and sentence for harassment in the second degree, contending there was insufficient evidence supporting the conviction, the district court abused its discretion on evidentiary issues, and the district court abused its sentencing discretion. **AFFIRMED.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Oxley, and McDermott, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which Appel, J., joined.

Kent A. Simmons (argued), Bettendorf, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**McDONALD, Justice.**

On the morning of April 30, 2018, Latrice Lacey attacked Clyde Richardson outside Richardson's place of employment. She shoved Richardson against the front of his employer's building, screamed and cursed at him, struck him with her arms and hands, kneed or attempted to knee him in the groin, and struck him with a small sledgehammer. A surveillance camera recorded the attack. One of Richardson's coworkers observed the attack from a distance of several feet. A local resident on her way to work heard the attack.

The State charged Lacey with three counts of domestic abuse assault and one count of harassment in the first degree. The case went to trial in March 2019, and the jury could not reach a verdict on any of the counts. The case went to trial a second time in September 2019, and the jury found Lacey guilty of harassment in the second degree, in violation of Iowa Code section 708.7(3)(*a*) (2018), but could not reach a verdict on the remaining counts. The district court declined to stay sentencing, sentenced Lacey to one year of incarceration, suspended the sentence, and placed Lacey on probation. Lacey timely filed this appeal.

After Lacey filed this appeal, the State continued to prosecute her on the three assault counts. Because the prosecution continued in the district court, the parties questioned whether Lacey's conviction for harassment in the second degree was a final judgment and whether this court had jurisdiction over her appeal. We requested supplemental briefing on the issue. Subsequently, in September 2021, Lacey went to trial on the three counts of assault, and the jury

found her not guilty, thus rendering moot the issue of whether there was a final judgment. Despite the issue being moot, we choose to resolve the issue under the public-importance exception to the mootness doctrine. For the reasons expressed below, we conclude Lacey's conviction for harassment was a final judgment appealable as a matter of right.

In addition to this jurisdictional issue, Lacey raises three substantive issues. First, Lacey argues there is insufficient evidence to support her conviction for harassment. Second, Lacey argues the district court abused its discretion in excluding a series of harassing text messages Richardson sent to her and in disallowing her from testifying about her training and knowledge of the cycle of domestic abuse. Third, Lacey argues the district court abused its sentencing discretion. We conclude Lacey's conviction is supported by substantial evidence, and we conclude the district court did not abuse its discretion in its evidentiary rulings or in imposing sentence.

## I.

We first address the jurisdictional issue: whether the imposition of judgment of sentence for a single count in a multicount trial information or indictment is a final judgment appealable as a matter of right when an additional count or counts in the same trial information or indictment remain pending.

## A.

After Lacey filed her appeal in this case and after the parties briefed the jurisdictional issue, Lacey went to trial on the remaining charges of assault. The jury acquitted Lacey on all three counts. The acquittal terminated the litigation

between the parties on the merits of all issues, and mooted the jurisdictional question. The parties nonetheless urge that we decide the issue under the public-importance exception to the mootness doctrine. Application of the exception is appropriate "where matters of public importance are presented and the problem is likely to recur." *Homan v. Branstad*, 864 N.W.2d 321, 330 (Iowa 2015) (quoting *In re Guardianship of Kennedy*, 845 N.W.2d 707, 711 (Iowa 2014)). In determining whether we should apply the exception, we consider four factors:

> (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*State v. Avalos Valdez*, 934 N.W.2d 585, 589 (Iowa 2019) (quoting *Homan*, 864 N.W.2d at 330).

We conclude these factors weigh in favor of applying the public-importance exception and deciding the issue on the merits. The finality of a criminal judgment is a public matter affecting the administration of justice. The parties agree that this is a matter of first impression for this court and that authoritative adjudication of the issue is desirable to guide trial courts, prosecutors, and the criminal defense bar. The issue is likely to recur; juries can and do find defendants guilty of fewer than all counts in a trial information or indictment while deadlocking on other counts that thus remain pending. *See, e.g., Hebron v. State*, No. 18–1554, 2019 WL 4297251, at *1 (Iowa Ct. App. Sept. 11, 2019); *Brown v. State*, No. 17–0030, 2018 WL 4922941, at *2 (Iowa Ct. App. Oct. 10, 2018). As this case demonstrates, the issue will likely evade appellate review due to the pending count or counts being resolved in the district court before the

appellate process concludes. We thus exercise our discretion to decide the issue on the merits despite it being moot as to Lacey.

B.

Criminal defendants have a right to appeal from "[a] final judgment of sentence." Iowa Code § 814.6(1)(*a*). The requirement that a judgment be final before a party may appeal as a matter of right is foundational and long-established in this state. *See, e.g.*, *State v. Davis*, 47 Iowa 634, 635 (1878) ("[S]tatute provides for appeals to this court only from *final* judgments."). A judgment is final and appealable "when it terminates the litigation between the parties on the merits" and "leaves nothing to be done but to enforce by execution what has been determined." *State v. Propps*, 897 N.W.2d 91, 96 (Iowa 2017) (quoting *State v. Aumann*, 236 N.W.2d 320, 321–22 (Iowa 1975)). Generally, "[f]inal judgment in a criminal case means sentence." *Id.* (alteration in original) (quoting *Daughenbaugh v. State*, 805 N.W.2d 591, 595 (Iowa 2011)).

We have not squarely addressed the issue of whether judgment of sentence on fewer than all the counts of a multicount trial information is final for the purposes of appeal. However, we have concluded that a dismissal on fewer than all the counts of a multicount trial information is a final order. In *State v. Lekin*, the defendant was charged with five separate counts in a single trial information. 271 N.W.2d 697, 699 (Iowa 1978). The district court sustained the defendant's demurrer on two of the charges and dismissed them. *Id.* The defendant subsequently was convicted of one of the remaining charges and acquitted of the other two. *Id.* The defendant appealed his conviction, and the state cross-

appealed the demurrer on the two dismissed charges. *Id.* The defendant contended that the state's appeal of the demurrer was untimely. *Id.* This court held that the demurrer was a final judgment. *Id.* at 700. Like a civil case, "the general rule in criminal cases is that a judgment is final for purposes of appeal when it terminates the litigation on the merits and leaves nothing to be done but to enforce by execution what has been determined." *Id.* "However, the rule that to be final the judgment must dispose of the entire case does not apply when distinct causes of action are united in the same suit." *Id.* Since the trial court's dismissal order disposed of the two counts such that no further prosecution could be maintained, it was a final judgment appealable as a matter of right. *Id.* Since the trial court's order sustaining the demurrer on the two charges was a final judgment, the state's cross-appeal outside the sixty-day limit for appeals was untimely. *Id.*

The rationale in *Lekin* applies with equal force with respect to the imposition of judgment of sentence for some, but not all, counts in a multicount trial information or indictment. The majority of courts that have considered this issue have also concluded that judgment of sentence on fewer than all the counts of a multicount case is a final judgment appealable as a matter of right even where other counts in the case remain pending. *See, e.g.*, *United States v. King*, 257 F.3d 1013, 1019–20 (9th Cir. 2001) (concluding the defendant's guilty plea to a subset of counts in an indictment "effectively severed" those counts from the thirty-one counts that remained unresolved); *United States v. Abrams*, 137 F.3d 704, 706–07 (2d Cir. 1998) (per curiam) (finding sentencing on three counts was

final and appealable even though the trial court declared a mistrial on ten other counts); *United States v. Powell*, 24 F.3d 28, 31 (9th Cir. 1994) ("When sentence was imposed on the severed counts, Powell was entitled to appeal because there was nothing left to be done but to enforce the sentence. The fact that he had not yet been tried on the remaining count did not preclude him from appealing the convictions after the first trial."); *Jones v. State*, 78 So. 3d 706, 709 (Fla. Dist. Ct. App. 2012) (holding sentencing on two counts in a three-count indictment is final and appealable even though the third count was severed); *State v. McCave*, 805 N.W.2d 290, 301–04 (Neb. 2011) (finding defendant appealed from a final order after he was sentenced on three counts and a mistrial was declared on one count and stating this approach is the majority rule); *State v. Catt*, 435 P.3d 1255, 1267 (N.M. Ct. App. 2018) (holding defendant was "sufficiently aggrieved" by her sentence so as to permit immediate appeal despite the jury deadlocking on two other counts); *State v. Smith*, 785 P.2d 1081, 1082 (Or. Ct. App. 1990) (holding counts in a single indictment that are severed for trial are separate cases and a sentence on fewer than all counts in the indictment is appealable); *see also United States v. Kaufmann*, 985 F.2d 884, 891 (7th Cir. 1993) (stating "several circuits have, without addressing the question of appellate jurisdiction, entertained an appeal on one count of a criminal indictment while other counts of the indictment were unresolved" and collecting cases).

Other jurisdictions have reached the opposite conclusion, holding that a judgment of sentence is not final and appealable if it resolves some, but not all, charges in a case. *See, e.g., State v. Waters*, 597 S.W.3d 185, 188 (Mo. 2020)

(en banc); *State v. Craig,* 151 N.E.3d 574, 578–80 (Ohio 2020). We believe these cases are distinguishable. Both *Waters* and *Craig* involved interpretation of state-specific statutes or rules. In Missouri, court rules prevented severance of the counts in an indictment absent permission of the trial court, which had not been granted. *Waters,* 597 S.W.3d at 188–89 (citing Mo. Sup. Ct. R. 24.07). In Ohio, the court was constrained by its own interpretation of the term "final order" as one resolving all counts in an indictment. *See Craig,* 151 N.E.3d at 578 (citing Ohio Rev. Code § 2505.02(B)(1)). Iowa's statutes and rules do not require a similar result.

We also believe the minority approach creates unjust outcomes for criminal defendants. Specifically, the minority approach interferes with a defendant's right to challenge her conviction and sentence while serving the sentence. *See Abrams,* 137 F.3d at 707; *McCave,* 805 N.W.2d at 304. *McIntyre v. Hooks,* 165 N.E.3d 229 (Ohio 2020) (per curiam), demonstrates the shortcomings of the minority approach. In that case, the defendant was sentenced to a term of incarceration between twenty-two and forty-six years. *Id.* at 230. However, one count in his indictment remained unresolved for twenty-five years, during which time the defendant languished in prison without having an appeal to challenge the conviction or sentence. *Id.* at 235 (Donnelly, J., dissenting). We find that situation untenable.

We are convinced the majority approach is more consistent with our well-established precedent that judgment in a criminal case means sentence. *Propps,* 897 N.W.2d at 96; *Daughenbaugh,* 805 N.W.2d at 595. We are also convinced

the majority approach results in the fairer administration of criminal justice. While we have stated a preference against piecemeal appeals, *see Valles v. Mueting*, 956 N.W.2d 479, 483 (Iowa 2021), that preference is outweighed by our preference for the prompt resolution of criminal matters, *see State v. Carter*, 158 N.W.2d 651, 655 (Iowa 1968) ("Determination of guilt or innocence as a result of a fair trial, and prompt enforcement of sentences in the event of conviction, are objectives of criminal law." (quoting *United States v. Johnson*, 327 U.S. 106, 112 (1946))); *see also, e.g.*, Iowa R. Crim. P. 2.9 (requiring prompt assignment of trial dates in criminal cases); Iowa R. App. P. 6.902 (requiring appellate courts to prioritize criminal appeals over civil appeals).

We thus hold that when separate charges are made in a single information or indictment, entry of judgment of sentence on any one of them is a final judgment appealable as a matter of right. Because Lacey timely appealed as a matter of right from the judgment of sentence for harassment, this court has jurisdiction over her appeal.

## II.

Having concluded we have jurisdiction over Lacey's appeal, we first address Lacey's challenge to the sufficiency of the evidence supporting her conviction for harassment in the second degree. This court reviews challenges to the sufficiency of the evidence for the correction of legal error. *See State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). Under this standard, the court is highly deferential to the jury's verdict. We will affirm the jury's verdict when the verdict is supported by substantial evidence. *State v. Webb*, 648 N.W.2d 72, 75–

76 (Iowa 2002). Evidence is substantial when the quantum and quality of evidence is sufficient to "convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* In conducting substantial-evidence review, this court considers the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. *Id.* "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010) (quoting *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004)).

When viewed in the light most favorable to the State, the jury could have found the following. Lacey and Richardson have known each other since Lacey's childhood in Chicago. Initially, they were platonic friends, but they commenced an intimate relationship that ended in about 2012. After the end of their intimate relationship, Lacey and Richardson continued to cohabit on and off for the next five years until approximately April 2017, when Richardson moved out of Lacey's house in Davenport and obtained his own apartment, also in Davenport.

In September 2017, Lacey began dating Charley Davis. Richardson first met Davis in January 2018, when Richardson arrived unannounced at Lacey's house to retrieve something that belonged to him. Lacey testified that Richardson had a negative reaction to Lacey's relationship with Davis. Richardson's negative reaction was based, at least in part, on his racial animus—Richardson and Lacey

are Black, and Davis is white. Lacey testified that Richardson, outside of Davis's presence, threatened to throw her down the stairs.

A few days later, Richardson returned to Lacey's home again without notice. Lacey attempted to refuse him entry, but Richardson pushed past her and went upstairs to retrieve spackling tools and a tarp. After Richardson came downstairs, Lacey ordered him to leave the house. He ignored her. Lacey and Richardson exchanged some words, and Richardson put his hands around Lacey's neck and strangled her. Lacey's teenage daughter witnessed the end of this interaction. Upon seeing Lacey's daughter, Richardson let go of Lacey and left the house.

Over the next several months, Richardson harassed Lacey because of her interracial relationship with Davis and his resulting jealousy. Someone smashed the windows of Davis's car, and Lacey suspected it was Richardson. Richardson left Lacey numerous voicemail messages. He sent Lacey numerous text messages, some of which were apologetic, but most of which were sexually explicit, offensive, or threatening. For example, Richardson sent Lacey a Valentine's Day message that he ended with "love OJ," which Lacey understood to be a threatening reference to O.J. Simpson. Other messages showed Richardson was continuing to come by Lacey's house. Lacey quit responding to the text messages in January 2018. She testified the text messages made her feel threatened and afraid.

The event that precipitated Lacey's attack on Richardson occurred late at night on April 29 or in the early hours of April 30. On the morning of April 30,

Lacey and Davis discovered that Lacey's garage had been burglarized and that her property had been vandalized. The doorframe on the side door of the garage had been damaged, and the front and back windshields of Davis's car had been smashed. Lacey found a small sledgehammer in the garage, which she did not recognize. Lacey suspected Richardson was the perpetrator. Lacey called a friend, Evelyn Nelson, for a ride. Nelson picked Lacey up and drove her to Richardson's place of employment. Lacey brought the sledgehammer with her.

When Lacey and Nelson arrived at Richardson's place of employment, it was not yet open. Lacey knocked on the door and called for Richardson to come outside. While Lacey and Nelson were outside the building, Mark McDonnell, one of Richardson's coworkers, arrived for work. As McDonnell was unlocking the front door to enter the building, Richardson exited and Lacey immediately confronted him. McDonnell testified Lacey shouted to Richardson, "[W]as this the reaction you were looking for?" McDonnell heard a loud thud and saw Lacey pushing Richardson against the building's front window. McDonnell then saw Lacey swing at and strike Richardson a few times with her arms and hands. Lacey also kneed, or attempted to knee, Richardson in the groin. Richardson put his hands up, palms out and at shoulder level, "like he was trying to protect himself." But Lacey continued swinging and yelling at Richardson. She accused Richardson of breaking into her garage and, at one point, profanely insulted his mother.

While Lacey was attacking Richardson, Nelson returned to the car and retrieved a baseball bat from the backseat. Richardson saw this and turned his

attention toward Nelson. Richardson asked Nelson what she planned to do with the bat, and Nelson replied, "I'll use it if I have to." McDonnell testified Nelson's demeanor was relatively calm. McDonnell also testified he did not hear Richardson make any threats toward Nelson. While Richardson's attention was focused on Nelson and the baseball bat, Lacey returned to the car and retrieved the sledgehammer. Lacey walked back towards Richardson and swung the hammer at him, striking him once in the arm. She swung the hammer at Richardson a second time, but Richardson was able to grab hold of the hammer and throw it on the ground away from Lacey.

Emily Gordon, who lived across the street from Richardson's workplace, was on her way to work at the time of the attack. While walking to her car she heard "a lot of loud yelling" and "a very loud voice screaming a lot of swear words." She heard "the F word several times" and "some things that sounded like threats." The only specific threat she testified to was a female voice saying, "I'm gonna beat you." The speaker of this threat had the only loud voice, with the rest of those present speaking more quietly. Gordon testified that she heard most of the fracas but could not see the scene well, if at all. Gordon called 911 but left the scene before police arrived.

After Richardson threw the hammer on the ground, Lacey returned to Nelson's car. Richardson walked up the street to speak with Nelson. Richardson and Nelson seemed calm while speaking. Nelson and Lacey left shortly thereafter. Richardson went to the police station to report the incident. At the police station,

a civilian crime scene technician took photographs of the injury to Richardson's arm.

In addition to the eyewitness and earwitness testimony, a surveillance camera across the street from Richardson's place of employment recorded the entirety of the attack. The video was admitted into evidence and corroborates the testimony of witnesses McDonnell and Gordon.

Where, as here, the jury was instructed without objection, the jury instructions are the law of the case for the purposes of reviewing the sufficiency of the evidence. *State v. Banes*, 910 N.W.2d 634, 639–40 (Iowa Ct. App. 2018). With respect to the charge of harassment in the second degree, the district court instructed the jury the State was required to prove the following:

> 1. On or about the 30th day of April, 2018, the defendant purposefully and without legitimate purpose, had personal contact with Clyde Richardson.
>
> 2. The defendant communicated a threat to commit bodily injury.
>
> 3. The defendant did so with the specific intent to threaten, intimidate, or alarm Clyde Richardson.

Although these instructions are the law of the case for the purposes of this appeal, we independently note the instructions are a correct statement of the law. *See* Iowa Code § 708.7(1)(*b*), (3)(*a*).

With respect to the first element, when viewed in the light most favorable to the State, substantial evidence supports the jury's finding that Lacey had no legitimate purpose in having personal contact with Richardson. The jury was instructed that justification was not a defense to the charge of harassment. It is

thus irrelevant that Richardson may have made statements evidencing racial animus or that he may have acted unlawfully towards Lacey and Davis. Physical violence was not and is not a legal or legitimate response to Richardson's conduct. *See State v. Miller*, 622 N.W.2d 782, 786 (Iowa Ct. App. 2000) ("Iowa public policy evinces the modern distaste for violent self-help . . . ."); *see also Walker v. Benz*, 914 So. 2d 1262, 1269 (Miss. Ct. App. 2005) (en banc) (stating that it was not proper for the jury to consider that an assault victim "got exactly what he deserved" because he was a "bad" man who "deserved a beating").

Lacey responds that her intent in having physical contact with Richardson was not to attack him but was instead to speak with him. Lacey testified that Nelson picked her up to drive Lacey to the police station to file a report. Lacey testified that they happened to drive by Richardson's place of employment while on the way to the police station. She testified she decided to "stop and talk to him" in an effort to make his actions cease. She contends her intent to reason with Richardson and have him cease his harassing conduct was a legitimate purpose. But the jury was free to reject Lacey's testimony that she went to Richardson's place of employment for a legitimate purpose—to peaceably speak to and reason with Richardson—and instead conclude she went to Richardson's place of employment for an illegitimate purpose—to attack Richardson. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." (quoting *State v. Anderson*, 517

N.W.2d 208, 211 (Iowa 1994), *overruled on other grounds by State v. Heemstra*, 721 N.W.2d 549 (Iowa 2006))).

Indeed, other evidence is contrary to Lacey's testimony and better supports the latter finding. Although Lacey testified she was going to the police station to file a report and only incidentally happened upon Richardson's place of employment, she never actually went to the police station. From this, the jury could infer Lacey intended to go to Richardson's place of employment to confront him. Although Lacey claimed she went to Richardson's place of employment to speak to and reason with him, she made no attempt to do so. Instead, as McDonnell testified, Lacey almost immediately attacked Richardson as he emerged from the building. She shoved him against the building, then swung at and struck him with her arms, fists, and knees. She cursed and yelled at him in a loud voice and threatened to beat him. When Richardson disengaged and turned his attention toward Nelson, Lacey did not deescalate the situation. Instead, she went to the car, retrieved a sledgehammer, and struck Richardson with the sledgehammer. Lacey's conduct in this case was "nothing more than vigilante self-help." *Miller*, 622 N.W.2d at 786. "He deserved a beating" is not a legal justification for violent conduct.

Furthermore, even if Lacey initially intended to speak to and reason with Richardson, her purpose lost any legitimacy once she communicated a threat of bodily injury. A "true threat"—meaning "a statement that an ordinary, reasonable person, familiar with the context in which the statement was made, would interpret as a threat"—does not serve a legitimate purpose. *State v. Button*,

622 N.W.2d 480, 485 (Iowa 2001) (en banc) (quoting *State v. Milner*, 571 N.W.2d 7, 13 (Iowa 1997)). Lacey's threat to Richardson—"I'm gonna beat you"—was a true threat in this context, especially since it was accompanied by physical violence. A rational trier of fact could determine that Lacey made the threat without a legitimate purpose, regardless of her purported intention in first confronting Richardson. *See id.* at 486 (finding no legitimate purpose behind threat to kill a police officer and upholding conviction for second-degree harassment); *State v. Sponsler*, No. 13–0349, 2014 WL 956017, at *3 (Iowa Ct. App. Mar. 12, 2014) (holding second-degree harassment defendant had no legitimate purpose in uttering the threat "I'm going to kick your ass," even if defendant was attempting to defend a friend); *State v. Cramer*, No. 09–0957, 2010 WL 2925127, at *2–4 (Iowa Ct. App. July 28, 2010) (second-degree harassment defendant's written threat to "fuck Tom up" was not made with a legitimate purpose, even if defendant had a legitimate purpose in writing to the recipient to express his feelings).

With respect to the second element, substantial evidence supports the jury's verdict that Lacey communicated a threat to commit bodily injury. Using the ordinary meaning of the word, a "threat" means to "promise punishment, reprisal, or other distress to" another. *Milner*, 571 N.W.2d at 10 (quoting *State v. Crone*, 545 N.W.2d 267, 271 (Iowa 1996) (en banc)). "Threats need not be explicit; they may be made by innuendo or suggestion" and need only "be definite and understandable by a reasonable person of ordinary intelligence." *Crone*, 545 N.W.2d at 271. "Moreover, in considering whether a reasonable person of

ordinary intelligence would interpret another's statement as a threat, the statement is viewed in light of the surrounding circumstances." *Milner*, 571 N.W.2d at 10. Here, Gordon testified that she heard one female voice yelling and heard the same female state, "I'm gonna beat you." In light of the surrounding circumstances, this was sufficient to establish a threat to commit bodily injury. *See State v. Fishback*, No. 14–1219, 2015 WL 5965075, at *1–3 (Iowa Ct. App. Oct. 14, 2015) (statement by defendant that, "I will beat your ass," was a clear threat to commit bodily injury); *Sponsler*, 2014 WL 956017, at *3 (defendant communicated a threat to cause bodily injury when he told victim, "I'm going to kick your ass"); *see also Lainhart v. State*, 916 N.E.2d 924, 939 (Ind. Ct. App. 2009) (defendant's statement to victim, "[G]et your fat ass out of the car, I'm gonna beat you down," constituted a threat under Indiana's intimidation statute (alteration in original)).

While Lacey does not contest that the statement "I'm gonna beat you" is a threat to commit bodily injury, she does contest whether there was sufficient evidence she made the statement. Lacey contends that Gordon did not specifically identify Lacey as the person who made the threat. We conclude Lacey's argument is without merit. The testimony showed that the only person who yelled and spoke with a loud voice during the attack was Lacey. The testimony also showed that the only person who engaged in violence and beat anyone was Lacey. A rational trier of fact could conclude Lacey made the threat to Richardson.

With respect to the third element, there is substantial evidence that Lacey had the specific intent to threaten, intimidate, or alarm Richardson. Harassment is a specific-intent crime, and intent is "seldom capable of direct proof." *State v. Evans*, 672 N.W.2d 328, 331 (Iowa 2003). Intent may be inferred from the "normal consequences of one's actions." *Id.* (citing *State v. Chang*, 587 N.W.2d 459, 462 (Iowa 1998)). Lacey and Richardson had a very acrimonious history with allegations of violence, threats, and property crimes. Lacey and a friend showed up at Richardson's workplace in order to confront him, and Lacey very quickly pushed him against a window, swung at him and hit him with a hammer, and communicated a threat to beat him. Physical violence is not a required element of harassment, but it is powerful evidence here that Lacey intended to threaten, intimidate, or alarm Richardson. *See Evans*, 672 N.W.2d at 331; *Button*, 622 N.W.2d at 484.

Indeed, the evidence in this case establishing Lacey's specific intent is much stronger than in other cases where our appellate courts have found sufficient evidence to sustain a conviction for harassment. In *State v. Evans*, this court held that the defendant's attempt to look at and grab the victim's feet would alarm the victim and be sufficient evidence to establish an intent to alarm. 672 N.W.2d at 331. In *State v. Button*, we held that the defendant's attempt to kick a police officer and threat to shoot the officer evidenced an intent to alarm even though the defendant was handcuffed and thus unable to carry out the threat. 622 N.W.2d at 483–84. In *State v. Fishback*, the defendant left a voicemail message for a deputy in which the defendant threatened to "beat his ass" and

challenged the deputy to "man up" and "come to me." 2015 WL 5965075, at *2. The court of appeals held this was sufficient to establish "the intent to intimidate, annoy, or alarm" the deputy. *Id.* In *State v. Sponsler*, the court of appeals held that the defendant's statement to a deputy that he was going to "kick [his] ass" and assault him was sufficient to establish the "specific intent to intimidate, annoy, or alarm" the deputy even though the defendant was handcuffed and seated in an ambulance. 2014 WL 956017, at *3. In *State v. Cramer*, the court of appeals held that a letter containing a threat of violence was sufficient to establish the requisite intent even though the threat could not be immediately carried out. 2010 WL 2925127, at *6. Here, not only was there a threat of violence, there was actual violence.

Viewing the evidence in the light most favorable to the State, including all reasonable inferences, there was sufficient evidence to convict Lacey of second-degree harassment. The testimony of McDonnell and Gordon, taken together with the surveillance video, could lead a reasonable juror to conclude that Lacey initiated personal contact with Richardson for the illegitimate purpose of attacking him, that during the course of the attack she communicated a threat to commit bodily injury, and that she did all of this with the specific intent to threaten, intimidate, or alarm Richardson.

III.

Lacey next challenges two evidentiary rulings. She contends the district court erred in disallowing her from testifying about the domestic abuse cycle. She also contends the district court erred in excluding from evidence certain text

messages Richardson sent to her. Our review of these evidentiary rulings is for an abuse of discretion. *State v. Huston,* 825 N.W.2d 531, 536 (Iowa 2013). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable[,] . . . [or] if it bases its conclusions on an erroneous application of the law." *Stender v. Blessum,* 897 N.W.2d 491, 501 (Iowa 2017) (citation omitted). The party alleging error has the burden to establish that the district court abused its discretion in making its decision on admissibility. *McClure v. Walgreen Co.,* 613 N.W.2d 225, 235 (Iowa 2000) (en banc).

A.

We first address the district court's evidentiary ruling disallowing Lacey's testimony regarding the domestic abuse cycle. During direct examination, Lacey's attorney asked Lacey whether she had received training regarding "patterns that are seen in domestic abuse relationships." Lacey said she had, and her attorney asked her to describe those patterns. The State objected, and a discussion was held outside the presence of the jury. The district court disallowed the testimony, but Lacey did not make an offer of proof regarding her proposed testimony. The State contends that by failing to make an offer of proof, Lacey failed to preserve error on the issue. We agree.

Error on appeal cannot be predicated on a ruling excluding evidence unless either the party that is offering the evidence "informs the court of its substance by an offer of proof," or "the substance was apparent from the context." Iowa R. Evid. 5.103(*a*)(2); *see also Brooks v. Holtz,* 661 N.W.2d 526,

529 (Iowa 2003). "The purpose of an offer of proof is to give the trial court a more adequate basis for its evidentiary ruling and to make a meaningful record for appellate review . . . ." *Eisenhauer ex rel. Conservatorship of T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 17 (Iowa 2019) (omission in original) (quoting *State v. Ritchison*, 223 N.W.2d 207, 212 (Iowa 1974)). An offer of proof is insufficient if it forces a reviewing court to speculate as to what the excluded testimony would have been. *See State v. Greene*, 592 N.W.2d 24, 27 (Iowa 1999); *Ritchison*, 223 N.W.2d at 212–13; *Stevenson v. Abbott*, 99 N.W.2d 429, 431 (Iowa 1959).

On this record, we cannot discern what the substance of Lacey's proposed testimony regarding the domestic abuse cycle would have been. The substance is also not apparent from the context. The domestic abuse cycle can have many effects—some contradictory—depending on the facts and circumstances of a particular case. *See Linn v. State*, 929 N.W.2d 717, 735 (Iowa 2019) (stating that researchers have "urged caution in adopting a single notion of a BWS [(battered women's syndrome)] victim" and "BWS victims do not fit a stereotype"); *see also Gipson v. State*, 772 S.E.2d 402, 410 (Ga. Ct. App. 2015) (collecting cases). Without an offer of proof, we can do no more than speculate about the substance of Lacey's proposed testimony. Accordingly, we hold that Lacey failed to preserve error on the matter. *See State v. Leedom*, 938 N.W.2d 177, 191 (Iowa 2020); *see also People v. Bryant*, 717 N.Y.S.2d 136, 137 (App. Div. 2000) (holding trial court properly excluded expert testimony regarding battered women's syndrome where proponent made no offer of proof regarding the testimony).

B.

We next address the district court's decision to exclude certain text messages. The record shows that Richardson sent dozens of text messages to Lacey between January and April 2018. At trial, Lacey sought to admit all of the messages to demonstrate Richardson's harassment of her. The district court admitted many of the messages but excluded many others. The excluded messages were of three general varieties: those that contained graphic descriptions of sexual acts; those that contained evidence of Richardson's racial animus and his disgust that Lacey was dating a white man; and those that expressed Richardson's fear of going to jail based on unspecified allegations Lacey might have made against him. The district court found that the probative value of the excluded messages was substantially outweighed by the danger of unfair prejudice from admitting them and excluded the messages pursuant to Iowa Rule of Evidence 5.403.

Rule 5.403 allows a court to exclude "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Iowa R. Evid. 5.403. Whether evidence should be excluded under rule 5.403 is a two-part test: "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." *State v. Einfeldt*, 914 N.W.2d 773, 784 (Iowa 2018) (quoting *State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015)). "The relevant inquiry is not whether the evidence is prejudicial or inherently prejudicial but whether the evidence is unfairly prejudicial." *State v. Thompson*, 954 N.W.2d

402, 408 (Iowa 2021). Unfair prejudice means the "evidence has an undue tendency to suggest a decision on an improper basis." *Id.* (quoting *State v. Delaney*, 526 N.W.2d 170, 175 (Iowa Ct. App. 1994)). Our review of evidentiary decisions under rule 5.403 is for an abuse of discretion. *Id.* at 406; *State v. Martin*, 704 N.W.2d 665, 671 (Iowa 2005). "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.;' " *Thompson*, 954 N.W.2d at 408 (quoting *State v. Putman*, 848 N.W.2d 1, 10 (Iowa 2014)).

We first consider the probative value of the excluded text messages. The omitted messages were of low probative value because they were merely cumulative of an uncontested point in the trial: Richardson was a bad actor. Richardson did not testify at the trial, but the jury was presented with voluminous evidence of Richardson's conduct. Lacey testified her relationship with Richardson broke down after Richardson met Davis and learned Davis was white. She testified that Richardson threatened to kill her and return to her house "as long as [she had] that white motherf*cker living in [her] house." Both Lacey and Davis testified that Richardson had strangled Lacey and threatened her with violence. Lacey testified about her burgled garage and her suspicion that Richardson was the perpetrator, and the jury saw pictures of Davis's car with smashed windows. The text messages that were admitted showed Richardson sent threatening and harassing messages to Lacey for a period of several months. For instance, the district court admitted the Valentine's Day text message in which Richardson referred to himself as "OJ." The sheer volume of

text messages that were admitted, along with Lacey and Davis's testimony, allowed the jury to see that Richardson was racist, violent, angry, and harassing.

The excluded text messages were also of low probative value for a different reason—the specific content of the particular messages was not relevant to any issue in the case. What was relevant—at least according to Lacey—was the fact that Richardson was sending unwanted text messages and harassing her. She argues the jury could conclude from the mere fact of the unwanted text messages and other conduct that her confrontation with Richardson was for the legitimate purpose of stopping his actions against her. *See* Iowa Code § 708.7(1)(*b*) (stating an element of harassment is personal contact with another "without legitimate purpose"). But to establish the legitimacy of her purpose in confronting Richardson, it was not material that the messages were sexually explicit or racist as much as the fact that unwanted messages—of any type—were in fact sent. Stated somewhat differently, the fact that some of the messages contained sexually explicit material or contained racist statements would not have given Lacey legal justification to attack Richardson.

The low probative value of the excluded evidence was substantially outweighed by the danger of its prejudicial effect. As was noted during oral argument, the real purpose for proffering the excluded messages was to show the jury Richardson was a "monster." In other words, he deserved a beating. As discussed above, this is not the law in Iowa. Further, this kind of inflammatory purpose is exactly the kind of impermissible prejudicial effect that warrants the exclusion of evidence.

"Unfair prejudice exists when minimally relevant evidence could lead a jury to improperly use it to reach a decision based on inflammatory and emotional considerations that are unfavorable to a victim because of his or her conduct or lifestyle." *State v. Shearon*, 449 N.W.2d 86, 88 (Iowa Ct. App. 1989) (citing *State v. Wilson*, 406 N.W.2d 442, 447 (Iowa 1987)). Unfair prejudice exists when minimally relevant evidence is admitted to show the victim got what he deserved. In *State v. Shearon*, the court of appeals held testimony that a homicide victim had attempted to sexually assault a third party mere hours before he was killed created a strong risk of prejudice. *Id.* While the testimony was probative of the defendant's contention that the victim had acted aggressively towards him prior to the killing, this relevance was outweighed because the allegations risked inflaming the jury to believe that the victim "got what he deserved." *Id.*

We believe the district court correctly concluded the text message evidence risked misleading or confusing the jury and improperly shifting its focus to Richardson's own conduct—conduct that was already well established by other evidence presented to the jury. Given the district court's wide discretion under rule 5.403, we cannot conclude the district court's decision to exclude the text messages was clearly untenable or unreasonable under the circumstances presented. *See id.*; *see also Gregg v. United States*, 683 F.3d 941, 945 (8th Cir. 2012) (holding admitting evidence of the victim's prior bad acts would be unfairly prejudicial when, in attempting to prove self-defense, the defendant had already introduced other evidence to show the victim's propensity for violence, including evidence the victim had "severely battered" the defendant); *Webster*, 865 N.W.2d

at 243 (citing *Shearon* and holding the trial court did not improperly exclude evidence that the victim's ex-wife was pregnant when the victim struck her, especially since other evidence was admitted establishing the victim's violent tendencies towards women); *Wilson*, 406 N.W.2d at 447 (holding evidence that a male murder victim possessed child pornography and wore women's clothing was properly excluded as unfairly prejudicial, since the jury may have concluded that the victim "deserved to die"); *Walker*, 914 So. 2d at 1269.

## IV.

Lacey also raises two challenges to her sentence. Lacey first argues the district court should have stayed sentencing for her second-degree harassment conviction until after retrial on the remaining counts. She also challenges the sentence imposed.

## A.

The decision to proceed with sentencing or stay sentencing is within the sound discretion of the district court. Generally, a district court "must fix a date for pronouncing judgment, which must be within a reasonable time." Iowa R. Crim. P. 2.23(1). However, a delay in executing a sentence may be allowed "incident to the administration of justice." *State v. Hawkeye Bail Bonds, Sur.*, 565 N.W.2d 615, 617–18 (Iowa 1997). In some cases, it may disadvantage a defendant to delay sentencing. For instance, a defendant convicted of nonbailable offense may incur additional costs or lack access to services. *See* Iowa Code § 356.7(1) (directing that adult inmates in county jails may be billed for their housing costs); *Bomgaars v. State*, ___ N.W.2d ___, ___, No. 20–0375,

2021 WL 5456412, at *2 (Iowa Nov. 23, 2021) (noting that sex offender treatment programs are only available at the Newton Correctional Facility in Jasper County). In some other circumstances, a stay may work to the defendant's advantage. It is within the sound discretion of the district court to determine the appropriate course of action in the particular case.

In this case, we cannot conclude the district court abused its broad discretion in proceeding to sentence Lacey while other charges remain pending. A district court abuses its discretion when its decision is based on "grounds or reasons clearly untenable or to an extent that is clearly unreasonable," or if its conclusions are based on "an erroneous application of the law." *Stender*, 897 N.W.2d at 501. Here, the decision was not clearly untenable or unreasonable as Lacey herself requested that the matter be set for sentencing before reversing course and then requesting a stay. Since Lacey requested that the court proceed to sentencing, she "cannot now complain that the trial court acted beyond its authority because the court acted at [her] own request." *City of Des Moines v. Brooks*, 234 N.W.2d 385, 386 (Iowa 1975) (citing *State v. Kuchenreuther*, 218 N.W.2d 621 (Iowa 1974)). Further, Lacey has not identified any fact or other circumstances that demonstrate the district court should not have proceeded to sentencing.

## B.

Lacey next contends the district court abused its discretion in imposing a one-year suspended sentence. "[R]eview of a sentence imposed in a criminal case is for correction of errors at law." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa

2002). The decision of the district court to impose any particular sentence within the statutory limits is "cloaked with a strong presumption in its favor." *Id.* This court "will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure." *Id.*

Lacey argues that the sentencing court improperly considered the fact that she displayed a hammer while she committed the offense. She argues that since the jury deadlocked on the assault charges (counts one, two, and four) it necessarily did not find that she displayed a weapon to inflict injury or commit an assault on Richardson. Lacey also argues that she displayed the hammer in defense of her friend Evelyn Nelson and was justified in doing so. Finally, Lacey argues that the sentencing court impermissibly considered the display of the hammer as the "only factor" for increasing the sentence from the minimum statutory punishment. This, Lacey posits, is a "policy decision" that means "possession of a weapon will always result in the imposition of a sentence for incarceration."

We disagree with Lacey's argument and decline to disturb the sentencing court's exercise of discretion. The record is explicit that the court did not consider counts one, two, or four when sentencing Lacey. Record evidence (including Lacey's own testimony) indicated that Lacey wielded a hammer during the confrontation, and the sentencing court was free to consider this factor, along with others, in fashioning the sentence. *See State v. Longo*, 608 N.W.2d 471, 474 (Iowa 2000) (en banc). Contrary to Lacey's argument, the sentencing court considered additional factors besides her possessing the hammer, including the

seriousness of the offense, the fact that she was within arm's reach of Richardson during the incident, and the fact that she made a threat of physical harm after she appeared at his workplace. The court also considered Lacey's lack of criminal history as a mitigating factor. The record supports the facts upon which the court relied in imposing the sentence, and the court did not limit its consideration to a single factor, contrary to Lacey's argument. The district court did not abuse its discretion in sentencing Lacey.

V.

For the foregoing reasons, we affirm Lacey's conviction and sentence.

**AFFIRMED.**

Christensen, C.J., and Waterman, Oxley, and McDermott, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part, in which Appel, J., joins.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in parts I, II, and III.A of the majority opinion. I would hold the district court abused its discretion in refusing to admit many of Clyde Richardson's text messages to Latrice Lacey leading up to the charged harassment. These cruel, abusive text messages provide substantial support for Lacey's claim that she did not have specific intent to "threaten, intimidate, or alarm" Richardson—but merely to get him off her back.

Richardson, whom Lacey referred to as "uncle," was an older friend of Lacey from her youth in Chicago. At one point, they had an intimate relationship, but for the last five years Lacey had been trying to pursue her own life and career in Davenport and extricate herself from Richardson. Richardson resisted the effort by repeatedly showing up at her home unannounced, committing acts of violence including strangling her, and sending her nonstop texts.

Because Richardson didn't testify at trial, the texts were powerful evidence of how Richardson had been acting toward Lacey. A jury might question Lacey's testimony because of her bias and interest, but they couldn't question what Richardson had written in a text.

Unfortunately, the district court bowdlerized the texts. With very few exceptions, texts that made Richardson seem like a forlorn lover came *into evidence,* but texts that showed Richardson to be cruel and abusive toward Lacey were *excluded*.

Admitted: "im falling apart an I cant get a grip please boo."

Excluded: "If your are pregnant frfr I hope da baby dies I hope it kills u 2."

In my view, none of the majority's justifications for affirming the district court's exclusion of the abusive texts withstand scrutiny.

First, the majority contends that the jury didn't need to know that many of the texts were crudely sexually explicit about Lacey's relationship with a white man; all that was relevant was that he "was sending unwanted text messages and harassing her." I disagree. The nature of the messages mattered. These were particularly heinous. The jury needed to know how bad the harassment was. Maybe I'm missing something, but I don't see these messages as particularly "racist." Rather, I see Richardson objectifying Lacey as a sex object, taunting her about sex constantly, and trying to make her feel disrespectful of her community for having a relationship with a white man. Anyone receiving such messages would want to approach the harasser and ask them to stop.

Second, the majority cites a decision of our court of appeals, *State v. Shearon*, 449 N.W.2d 86, 88 (Iowa Ct. App. 1989). If that case is the majority's best, it isn't much. In *Shearon*, a homicide case, our court of appeals held the trial court properly refused to let the male defendant introduce evidence that that the male victim had tried to rape a woman two hours before he was killed. *Id.* at 87–88. The defendant had been unaware of that incident when he killed the victim. *Id.* at 87.

*Shearon* bears no resemblance to the present case. We are not talking about texts sent by Richardson to another person that Lacey never heard about.

Third, the majority contends there was other evidence of Richardson's treatment of Lacey. There was, but it came in through the testimony of Lacey and her family. The jury could have disbelieved that testimony. As I've already noted, there is no way to disbelieve the texts.

I respectfully reject the notion that a victim of abuse, who goes to meet her abuser to get him to stop and then is charged with harassment, should be barred from introducing the worst abuse into evidence because that would be unfair to the abuser. The issue of course isn't whether Richardson is a "monster," but whether he was a "monster" *to Lacey* during the time period leading up to the incident in question.

For the foregoing reasons, I dissent in part and would grant Lacey a new trial.

Appel, J., joins this concurrence in part and dissent in part.